L. ROTHSCHILD, Appellant, v. WABASH RAILROAD COMPANY, Respondent.

March 4, 1884.

1. COMMON CARRIERS — FREIGHT DISCRIMINATION. — A common carrier is bound to receive and carry freight without discrimination in its charges for the same services.

2. —— Discriminations in freight charges, based on the amount of freight shipped without reference to conditions tending to decrease the cost of transportation, are contrary to public policy.

3. —— CONTRACTS. — A carrier may employ shippers to perform valuable services, and may pay therefor lawful compensation, and that the compensation, thus allowed reduces such shipper's freight expenses does not necessarily operate as an unjust discrimination in his favor.

APPEAL from the St. Louis Circuit Court, ADAMS, J.
*Affirmed.*

PATRICK & FRANK and C. H. KRUM, for the appellant: The right to recover the excessive payments made by plaintiff to the defendant is sustained by the decisions ; the the payments are not considered by the courts as voluntary. — *Railroad Co.* v. *Steiner*, 9 Law & Eq. Rep. 39 ; *C. & A. R. Co.* v. *G. W. R Co.*, 79 Ill. 121 ; *Hays* v. *Pa. R. Co.*, 12 Fed. Rep. 309 and note; *Nicholson* v. *G. W. R. Co.*, 5 C. B. (N. S.) 366. A shipper is entitled to recover from the carrier the amount paid by him in excess of the rates accorded to others in the discharge of the same service ; this was so even at common law. — *Shipper* v. *Railroad*, 47 Pa. St. 341 ; *McDuffee* v. *Railroad*, 52 N. H. 445. *Cambloss* v. *Railroad*, 4 Brews. 622; *Vincent* v. *Railroad*, 49 Ill. 33 ; *C. N. W. R. R.* v. *The People*, 56 Ill. 365; *N. E. Co.* v. *Railroad*, 57 Me. 194 ; *Sloan* v. *Railroad*, 61 Mo. 24 ; Pierce on Railroads, 498, and authorities.

WELLS H. BLODGETT, for the respondent.

LEWIS, P. J., delivered the opinion of the court.

The petition states that the plaintiff, a dealer in cattle, shipped by the defendant's railway line, between the first day of August, 1877, and the first day of January, 1878, two hundred and forty-seven car loads of cattle from East St. Louis to Jersey City, for which he was compelled to pay $130 per car. That, at the same time, Nelson Morris, Samuel W. Allerton, and Timothy Eastman were also shippers of cattle over the same line, from and to the same points. That the defendant entered into a secret arrangement with the said three named persons, by which they were to pay a much less rate than was required and collected of the plaintiff, and less than the defendant would accept for the same service from the plaintiff or any other person. That, by reason of this unjust discrimination, plaintiff is damaged in the sum of $16,800, for which he prays judgment. The court heard the testimony, and declared the law thus : —

" The court declares the law to be, that a railroad company is bound to receive and carry without discrimination in its charges for the same services, and that if the evidence shows that the defendant ( or the ' Wabash,' which is the predecessor of the defendant ), charged plaintiff more for carrying his cattle from East St. Louis to Jersey City, than he charged S. W. Allerton, Nelson Morris, or T. G. Eastman for a similar service, then the plaintiff is entitled to recover the excess or overcharge so paid by him."

The court found upon the issues for the defendant. We do not perceive that this finding fails to harmonize with the facts of the case, and the law as declared by the court. It is not to be doubted, that in so far as the policy of the law forbids a direct discrimination between the common patrons of a public carrier, in the matter of charges for transportation, it equally denounces any attainment of the same result by indirect means, in the shape of rebates, drawbacks, or discounts. But none of these things appear in the present case. The arrangement of which the plain-

tiff complains was nothing more than a provision for compensating services undertaken and actually rendered by the three persons named.

It appears from the testimony, that in June, 1875, a meeting was held of representatives of the three great trunk lines of railway from the West, leading into the city of New York, to wit, the Pennsylvania Central, the Erie, and the New York Central, with the object of a uniform adjustment of rates on live stock. It was considered essential to such an adjustment, that each of the three roads should do a certain percentage, then agreed upon, of the entire carrying trade under consideration. In order to effect this, an arrangement was agreed upon between the companies and Messrs Morris, Eastman, and Allerton, whereby those gentlemen were to secure such a division of the shipments of live stock from the West, as would give to each of the roads its proper share of the entire trade. It was in contemplation that, in order to a performance of their part in the agreement, it might be necessary, from time to time, for these " eveners," as they were called, to make special purchases and shipments of stock, so as to make up any deficiencies that might appear in the proportionate amount of business done by either one of the roads. By way of compensation for their services and undertakings, they were to be paid a certain percentage upon all the stock shipments made over all three of the roads, whether by themselves, or by other persons. The compensation thus agreed upon amounted, at first, to about $20 per car, but it was afterwards reduced to about $10 per car. The " eveners " were also engaged in the business of purchasing and shipping cattle, and paid the same amounts for freights that were charged against other persons, including the plaintiff. It is the plaintiff's theory, that the commissions thus allowed to the " eveners " reduced by so much the expenses of their freightage, and thus operated an unjust

discrimination against the plaintiff, who enjoyed no such reduction.

The principle which forbids certain discriminations between persons who avail themselves of railway transportation depends upon a consideration of the common carrier's obligations to the whole public, and to everybody constituting a part of that public. Every such constituent is entitled to an equal and impartial participation in the facilities for which the corporation was created. Hence, in *Hays* v. *Penn. Co.* (12 Fed. Rep. 309), it was held that discriminations in the rates of freight charged by a railroad company to shippers, based solely on the amount of freight shipped, without reference to any conditions tending to decrease the cost of transportation, are discrimination in favor of capital, and contrary to sound public policy. "If one man engaged in mining coal, and dependent on the same railroad for transportation to the same market, can obtain transportation thereof at from twenty-five to fifty cents per ton less than another competing with him in business, solely on the ground that he is able to furnish and does furnish the larger quantity for shipment, the small operator will sooner or later be forced to abandon the unequal contest and surrender to his more opulent rival." But nothing in the principle here involved has anything to do with the case of a consideration rendered, whether in services or otherwise, by the shipper, for special rates not extended to others, even where such discrimination is expressly annexed to the charges for transportation. Thus, in *Nicholson* v. *G. W. R. Co.* (4 C. B. (N. s.) 366), the railway company gave lower rates to the Ruabon Coal Company, in a contract whereby the coal company undertook to ship, for a period of ten years, as much coal for a distance of at least one hundred miles over the railroad, as would produce an annual gross revenue of forty thousand pounds to the railroad company, in fully loaded

trains, at the rate of seven trains per week. It was held that the undertaking and guaranty of the coal company were promotive of the interest of the railroad company, and furnished an adequate consideration for the reduction of rates. The reduced rates were therefore not an unjust or unlawful discrimination against other shippers.

The test whereby to indentify a lawful or unlawful discrimination seems to be simple enough. A railway company may, from considerations deemed sufficient for its interest, or in the cause of benevolence, or of the public welfare, carry a passenger or his freight free of charge, without injustice to those who deal with it upon a purely commercial basis. But such transactions are far apart from a mere favoritism shown to capital, or to a particular business interest, at the expense of other interests which approach the company on a general commercial footing. The case of *Hays* v. *Penn. Co.* (*supra*), furnishes an illustration of the latter. So, also, a case where different rates are charged upon goods destined to different warehouses in the same city. *Vincent* v. *C. & A. R. Co.*, 49 Ill 33. And so, generally, whenever a railroad company agrees to carry goods for certain persons at a cheaper rate than it will for others, under the same conditions. *Messenger* v. *Penn. Co.*, 36 N. J. L. 407. It is reasonable to suppose that the company's losses in such gratuities to the favored ones will be recovered, directly or indirectly, in its dealing with the disfavored. Nothing in these cases suggested a parallel with the one before us.

Suppose a railway company, instead of paying its conductor a salary, should choose to compensate his services by a percentage of the receipts from passengers traveling on his train. Suppose the conductor to purchase tickets at regular rates, for the use of members of his family, as passengers on his train. He claims and receives his percentage on such tickets, as upon all others. Would it not be

strangely absurd to allege that, by reason of this percentage, there is an unjust discrimination in the conductor's favor, reducing the cost of transportation to him, below what others are compelled to pay for the same facilities? The principle involved would be exactly the same that appears in the present case. Neither reason nor precedent find any injustice or unfairness in either application of it.

It is sometimes a matter of judicial inquiry, whether the consideration rendered by the shipper is fairly adequate, and not comparatively valueless, except as a mere device to cover up the intended favoritism of the company. But no such question is raised in the present case. For aught that appears, the undertaking and services of the "eveners" were a fair equivalent for the percentage paid them. The judgment is affirmed, with the concurrence of all the judges.

THOMPSON, J., delivered a separate concurring opinion.

I concur in affirming the judgment, but I do not wish to be understood as agreeing to all the views stated in the opinion of the court.

This was an action at law, tried by the court without a jury. The learned judge declared the law to be as requested by the plaintiff, and then gave a verdict and judgment for the defendant. We are, therefore, called upon to review the finding of the court upon questions of fact. I do not see how we can do this unless it appears that the court rendered a verdict in entire disregard of uncontradicted evidence. So far from this appearing, it appears that the plaintiff's allegations and proofs were so defective in several particulars as to preclude us from saying that the learned judge was wrong in holding that they did not make out a case.

In the first place, the action is to recover damages for a violation by a railway company of its duty as a common carrier; but it does not allege that the defendant was a

common carrier. This defect in the petition might possibly have been aided by a verdict, had there been a verdict in the plaintiff's favor.

But defects of proof also supervened. The "evening contract," by its terms, related to cattle delivered in New York. But the cattle which the plaintiff's evidence shows that he shipped, were shipped to Jersey City. I do not know upon what principle we could say that the court, sitting as a jury, was bound to take notice of the fact, if it be a fact, that Jersey City is the cattle market of New York City, or the point at which all cattle shipped to New York City are, in fact, delivered.

Beyond this, the evidence is not so clear that the Wabash Railway Company was a party to this "evening contract," that we can say that the trier of the fact was bound to so find. I do not see any evidence that the Wabash Railway Company contributed towards paying the commissions of the "eveners" under the contract; nor does it appear that the line of this company extended further east than Toledo.

But I do not agree to so much of the opinion of the court as holds that if the plaintiff's evidence had been sufficient on these points he would not be entitled to recover damages. In my opinion, whenever two or more competing carriers make a contract with certain shippers, whereby, in consideration of the shippers so directing shipments as to enable the carriers to maintain a combination to keep up a rate of freight and prevent competition among themselves in the business of carrying goods, they allow the shippers, directly or indirectly, whether in the form of a "rebate" or "commission," or by whatever name it may be called, a lower rate for shipping the same goods than they exact of other shippers, such other shippers may sue for and recover what they have paid to any one of these carriers in excess of such lower rate. I think that railway carriers are bound to serve the public equally, just as the post-office depart-

ment serves the public equally; and, being of this opinion, I do not agree to so much of the opinion of the court as approves the doctrine of *Nicholson* v. *Great Western R. Co.*, (4 C. B. (N. S.) 336).

But as I see nothing in the record which puts the circuit court in the wrong, I agree to an affirmance of the judgment.